## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

LEONARD HARRIS,

    Plaintiff,

      v.

NAKITA ROSS, *Parole Agent, DPSCS,*
KERRI SMITH,
*FSI, Parole Supervisor, DPSCS,*
DANIELLE FLYNN,
*Field Supervisor II, DPSCS,*
MARTHA L. DANNER, *Director of*
*Parole and Probation, DPSCS,*
DAVID BLUMBERG,
*Maryland Parole Commission,*
OFFICER KYLE THOMAS,
*Elkton Police Department,*
OFFICER C. SOTO OCASIO,
*Maryland Transportation Authority,*
ANNE ARUNDEL COUNTY JENNIFER
ROAD DETENTION CENTER,
RHONDA OSBORN, *Detective,*
*Warrant Apprehension Unit,*
CLEVELAND C. FRIDAY, *Warden,*
*Jessup Correctional Institution,*
DEMETRIUS E. PAGE,
*Regional Administrator, DPSCS,*
BRUCE GERBER, *Maryland Division of*
*Parole and Probation,*
CORRIE McCALL,
*Parole Supervisor, DPSCS,* and
ERICA DYER, *Parole Agent,*

    Defendants.

Civil Action No. TDC-21-1983

## MEMORANDUM OPINION

Self-represented Plaintiff Leonard Harris, formerly confined at Jessup Correctional

Institution ("JCI") in Jessup, Maryland, has filed this civil action pursuant to 42 U.S.C. §§ 1981,

1983, and 1985 against Parole Agent Nakita Ross of the Maryland Department of Public Safety and Correctional Services ("DPSCS") and nine other DPSCS officials, consisting of Kerri Smith, Danielle Flynn, Martha L. Danner, Rhonda Osborn, Demetrius E. Page, Bruce Gerber, and Corrie McCall; David Blumberg of the Maryland Parole Commission; and Cleveland Friday, the Warden of JCI (collectively, "Defendants"). Also named as Defendants, but presently unserved, are Officer Kyle Thomas of the Elkton Police Department; Officer C. Soto Ocasio of the Maryland Transportation Authority; former DPSCS Parole Agent Erica Dyer, and the Anne Arundel County Jennifer Road Detention Center (collectively, the "Unserved Defendants"). In the operative Amended Complaint, Harris asserts violations of his rights based on the improper altering of the conditions of his mandatory release supervision and false assertions that he violated those terms, which resulted in his confinement at JCI pending a revocation hearing.

Defendants have filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment in relation to the Amended Complaint. The Motion is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Defendants' Motion will be GRANTED, and the claims against the Unserved Defendants will be DISMISSED pursuant to 28 U.S.C. § 1915(e)(2).

## BACKGROUND

### I.    Conviction and Sentence

On September 9, 1992, Harris was sentenced in the Circuit Court for Baltimore County, Maryland to a total of 29 years of imprisonment based on convictions for kidnapping, daytime housebreaking, carrying a weapon openly with intent to injure, and fleeing and eluding the police. On June 28, 2010, after serving approximately 18 years of his sentence, Harris was released on mandatory supervision under which he was to be subject to supervision by the DPSCS Division of

Parole and Probation ("DPP") until the expiration of the term of his sentence on November 29, 2020. Prisoners who are released on mandatory supervision are deemed to remain in "legal custody until the expiration of the individual's full term." Md. Code Ann., Corr. Servs., § 7-502(a) (West 2017).

Harris was initially supervised under general supervision and, according to Harris, by 2019 he had "progressed to a low-level parole supervision," which required only that he submit a monthly form to his parole agent. Am. Compl. at 10–11, ECF No. 20.

## II.   COMET Supervision

After completing approximately nine years of mandatory supervision, Leonard moved to Cecil County, Maryland in or about September 2019. Parole Agent Erica Dyer was assigned to supervise Harris as of November 2019. Harris alleges that, in December 2019, Dyer offered to place him on "Abatement of Parole" status beginning on February 12, 2020, on the condition that Harris provide proof that he had paid any outstanding debt to DPSCS. *Id.* at 11. Harris asserts that he accepted this offer, paid the debt, and sent Agent Dyer receipts reflecting his payment of all remaining debt owed. Agent Dyer then instructed Harris to call her on February 12, 2020 to confirm the change in his mandatory release status.

In February 2020, however, after receiving the file from Agent Dyer, DPP Field Supervisor II Danielle Flynn determined that DPP policy required that Harris be supervised as a sex offender because he had been charged with rape and attempted rape in the case underlying the conviction and sentence for which he was under mandatory supervision. Accordingly, Flynn determined that Harris would be transferred from general supervision to the program for such offenders, known as Collaborative Offender Management Enforcement Treatment ("COMET") supervision. Mot. Ex. 1D at 1, ECF No. 24-7. The COMET program is an intensive supervision program for sex

offenders that includes heightened reporting requirements, electronic monitoring, polygraph testing, and specialized treatment. Upon the transfer of Harris's case to the COMET program, Parole Agent Nakita Ross was assigned to his case.

On February 12, 2020, Agent Ross called Harris and informed him that she was now assigned to his case and that Harris was to report to her. Agent Ross told Harris that "someone had dropped the ball," that it was not his fault, but that Harris would be required to report more frequently. Am. Compl. at 11.

According to Harris, Agent Ross imposed more burdensome supervision requirements. Harris alleges that, on February 19, 2020, he reported to Agent Ross's office as requested, but Agent Ross then came out of her office and instructed him to come back on February 24, 2020 because her computer was not working. Then, on February 20, 2020, Agent Ross made an unannounced, in-person visit to Harris's home. Harris asserts that, during their conversation, Agent Ross became "loud and animated" to the point that neighbors took notice. *Id.* Agent Ross informed Harris that he would be subject to a polygraph test, GPS monitoring, and a curfew. Agent Ross warned Harris that if the polygraph test detected any lies, she would find Harris in violation of his release conditions.

On March 9, 2020, Harris attended his first official meeting with Agent Ross. At this meeting, Harris asked why the conditions of his mandatory release had changed. Agent Ross explained that being charged with a sexual crime, even without a conviction, is enough to warrant placement in the COMET program, but she would not describe the terms and conditions of his supervision going forward. Agent Ross also refused to provide Harris with written proof of his prior visits with her. According to Harris, this refusal demonstrated that at that time, Agent Ross already intended to find him in violation of his mandatory release conditions. At Harris's request,

Agent Ross provided Harris with two cards, one with her name and contact information and another with the name of her supervisor, Corrie McCall. In sending a later email to Agent Ross, Harris cc'ed both McCall and Kerri Smith, another supervisor listed on a prior email from Agent Ross. Harris alleges that Agent Ross subsequently chastised Harris for "tattling" on her to her supervisors by contacting McCall and Smith. *Id.* at 13.

On March 23, 2020, after the Governor of Maryland had ordered offices closed due to the COVID-19 pandemic, Harris had a previously scheduled meeting with Agent Ross. However, because Harris felt ill, he called Agent Ross and requested to reschedule. Harris alleges that Agent Ross "insisted" that he report for the in-person meeting and threatened to find him in violation if he did not appear. *Id.*

On March 31, 2020, Harris submitted to Agent Ross written documentation from his physician stating that, due to the state of his health, Harris should relocate away from Cecil County, Maryland and cease living alone. Harris alleges that Agent Ross failed to provide him with guidance on how to change his address in compliance with his conditions and that he therefore was forced to remain at his apartment in Cecil County and "risk his health and welfare." *Id.* at 14.

On April 6, 2020, Harris was scheduled for another meeting with Agent Ross. After Harris checked in and waited for 30 minutes, Agent Ross sent him an email changing the manner in which Harris was to report effective immediately, mandating that he acquire a phone, and directing him to report to her by phone by 4:00 p.m. that day.

Harris asserts that, between April 6, 2020 and May 4, 2020, Agent Ross "escalated verbal harassment and frequently did not answer the number provided to call." *Id.* Harris states that he was forced to call Agent Ross "for hours" before she answered the telephone and that the number worked only intermittently. *Id.* Harris alleges that Agent Ross "was intentionally making it

difficult for [him] to report" because he had previously contacted her supervisors about her behavior. *Id.*

On April 15, 2020, Harris wrote a letter to Judge Vicki Ballou-Watts of the Circuit Court for Baltimore County to request assistance in resolving the situation. On April 28, 2020, Harris wrote a second letter to Judge Ballou-Watts.

On May 4, 2020, Harris contacted Martha Danner, the DPP Director, about Agent Ross's conduct. Danner instructed Harris to report to Agent Ross by telephone daily and to leave a voicemail regarding his daily status. Harris alleges that Danner's response was retaliatory.

On May 13, 2020, when Harris called Agent Ross to report, she informed him that he was now required to report daily, per Danner's instructions. Agent Ross also provided Harris a specific telephone number to call on Mondays and another telephone number to call on Tuesdays through Fridays.

## III.  Failure to Report

On June 29, 2020, Harris attended an in-person meeting with Agent Ross. At this meeting, Agent Ross instructed Harris to continue reporting to her by telephone and that she would provide Harris with the date of his next in-person meeting. On July 13, 2020, Agent Ross informed Harris that his next in-person meeting was scheduled for July 20, 2020 at 4:00 p.m. Also on July 13, 2020, Agent Ross instructed Harris to disregard the telephone number previously provided to Harris for Monday calls and to use only the telephone number previously used for Tuesday through Friday calls.

Meanwhile, on July 8, 2020, Harris was instructed to visit the office and sign paperwork for a referral for a polygraph examination. Upon arriving at the office, Harris refused to sign the forms until after he had an attorney review them. Harris was instructed to return the signed

6

paperwork to Agent Ross by 10:00 a.m. on July 16, 2020. Harris failed to do so. Then, Harris failed to appear for the in-person meeting scheduled for July 20, 2020.

On July 23, 2020, Agent Ross filed a request for a warrant to have Harris arrested and detained for failing to report. In the request, Agent Ross stated that Harris had "refused to respond" to her emails, he claimed not to have a "viable telephone number," and she could not access his residence due to onsite restrictions. Mot. Ex. 1D at 2. Agent Ross also noted that Harris had refused to sign the paperwork for the polygraph referral.

The warrant was signed and issued by a parole commissioner on July 23, 2020. The warrant alleged that (1) Harris had violated Condition No. 1 of his mandatory supervision, which required that he report to and follow the parole agent's instructions, by failing to return the polygraph referral forms and to report in-person as directed on July 20, 2020; and (2) that he violated Special Condition No. 34, which required that he comply with the DPP's sexual offender management program, by failing to return the polygraph referral forms.

On July 24, 2020, Agent Ross sent Harris an email in which she stated that he had failed to report as instructed on July 20, 2020, that her efforts to reach him by phone and email were unsuccessful, and that he had not returned the polygraph referral forms. Agent Ross instructed Harris to report to the DPP office in Elkton, Maryland on July 27, 2020 at 4:00 p.m. According to Harris, he was not told and not aware that Agent Ross had requested a warrant.

Upon reporting to the Elkton office on July 27, 2020, Harris was arrested by the Elkton Police Department. Harris alleges that, during the arrest, Agent Ross instructed him to stop contacting her. According to Harris, he was held in custody by the Elkton Police Department for approximately 12 hours before they released him because "no valid arrest warrant was provided to them." Am. Compl. at 17. DPP records, however, show that after the arrest, law enforcement

brought Harris to Union Hospital in Elkton because he was complaining of a "medical issue." Mot. Ex. 1G at 1, ECF 24-10. At the hospital, law enforcement failed to remain with Harris, and after they left, he refused admission to the hospital based on a fear of contracting COVID-19, signed a release, and left. Harris was later observed leaving his residence with luggage in hand and informed a neighbor that he was "leaving." *Id.*

On August 12, 2020, Agent Ross submitted a supplemental report requesting that the Parole Commission update the Statement of Charges attached to the warrant to include information about the events following Harris's arrest, which she considered to constitute an escape, and to keep the warrant active. According to Harris, he did not report again because Agent Ross had told him at the time of his arrest that he should no longer contact her, and he believed that his mandatory supervision ended on November 29, 2020, the end date for his original sentence. On June 14, 2021, Harris was re-arrested and placed in the custody at JCI.

## IV. Revocation Proceeding

On July 30, 2021, Harris attended a parole revocation hearing before Commissioner Robyn Lyles. Commissioner Lyles determined that Harris had absconded from supervision and violated the conditions of his mandatory release by failing to report to a parole agent during and after July 2020. Despite the evidence of his violations, Commissioner Lyles did not revoke Harris's release; instead, she closed his case as unsatisfactory and released him from custody on the day of the hearing. Where Harris was 67 years old at that time, Commissioner Lyles reasoned that that "[d]uring the global COVID-19 pandemic," she had "revoked the release of elderly offenders with medical issues as a last resort, and typically only if they have committed a new crime while on supervision." Lyles Aff. ¶ 2, Mot. Ex. 3, ECF No. 24-29. She also concluded that Harris qualified

for COMET supervision and should have been placed on it when he was originally released in 2010.

## V.    Harris's Claims

Construed liberally, the Amended Complaint alleges multiple causes of action against Defendants in both their official and individual capacities. First, Harris alleges claims against Agent Ross and other DPSCS officials under 42 U.S.C. § 1983 for violating Harris's constitutional rights by subjecting him to "unconstitutional parole conditions" enforced in an unconstitutionally arbitrary or discriminatory manner, including making false statements in the affidavit for an arrest warrant, in violation of the Fourteenth Amendment rights to due process of law and equal protection of the law. Second, he alleges that Agent Ross retaliated against him for contacting Agent Ross's supervisor to complain about Agent Ross's actions, in violation of the First Amendment. Third, he asserts that Blumberg and Friday violated his rights under the Eighth Amendment based on unconstitutional conditions of confinement during his six weeks of detention at JCI. Fourth, he alleges that Defendants' conduct violated 42 U.S.C. § 1981 and constituted a conspiracy to deprive him of his federal rights, in violation of 42 U.S.C. § 1985. Finally, he alleges that multiple Defendants engaged in false imprisonment, wrongful arrest, and malicious prosecution by detaining Harris without a valid warrant and pursuing the revocation hearing. Harris seeks compensatory and punitive damages, attorney's fees, and costs.

## DISCUSSION

## I.    Preliminary Motions

In filing their dispositive motion, Defendants included a Motion to Seal certain exhibits containing sensitive information related to Harris. Although Harris objects to the Court's

consideration of some of these exhibits on relevance and related grounds, he does not provide a persuasive reason to refrain from sealing them. The Motion to Seal will therefore be granted.

Harris has also filed a Second Motion for Appointment of Counsel in which he asserts that he has been unsuccessful in retaining an attorney and that he now has some vision loss in one eye. Where Harris has adequately articulated his claims to date, he has not identified a condition that precludes him from representing himself in writing, and the case likely will not proceed to discovery, a hearing, or trial, the Court will deny the motion for the same reasons articulated in the Order denying the First Motion for Appointment of Counsel. *See* Order at 1, ECF No. 37.

## II.   Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment

In their Motion, Defendants seek dismissal of the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) or summary judgment under Rule 56 on the grounds that: (1) all claims against Defendants in their official capacities are not claims against "persons" as required to support a § 1983 claim and are also barred by the Eleventh Amendment to the Constitution; (2) Harris fails sufficiently to allege personal participation or supervisory liability as needed to support the claims against Osborne, Page, Gerber, Blumberg, Friday, and McCall; (3) the undisputed facts do not give rise to a violation of constitutional rights or commission of the state common law torts; and (4) Defendants are entitled to qualified immunity.

### A.   Legal Standards

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* A court must examine the complaint as a whole, consider the factual allegations

in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005). A self-represented party's complaint must be construed liberally. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, "liberal construction does not mean overlooking the pleading requirements under the Federal Rules of Civil Procedure." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020).

Defendants have attached several exhibits to their Motions. Typically, when deciding a motion to dismiss under Rule 12(b)(6), the Court considers only the complaint and any documents attached to that pleading. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment; and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted).

Here, the notice requirement has been satisfied by the title of Defendants' Motion. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d), or an equivalent filing, explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d); *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 245 (4th Cir. 2002). Harris has

11

not filed an affidavit seeking discovery, does not otherwise make a persuasive case that discovery is needed, and has submitted certain exhibits of his own with his memorandum in opposition to the Motion. The Court will thus construe Defendants' Motion as a Motion for Summary Judgment for purposes of the arguments requiring consideration of the submitted exhibits. As for Harris's objections to certain sealed exhibits, the identified exhibits, which include Harris's risk assessment, case notes, pre-sentence investigation report, and criminal case docket are all relevant to the issue of whether Harris was properly subjected to COMET supervision, and the Court finds their probative value is not substantially outweighed by the danger of unfair prejudice, so the Court will accept those exhibits as part of the record but keep them under seal. *See* Fed. R. Evid. 403.

Under Rule 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the motion, the Court views the facts in the light most favorable to the nonmoving party, "with all justifiable inferences" drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49.

## B. Official Capacity Claims

The Eleventh Amendment to the United States Constitution provides that "the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced

or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State." U.S. Const. amend. XI. In effect, the Eleventh Amendment bars suits for damages against a state in federal court unless the state has waived its sovereign immunity or Congress has abrogated its immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Accordingly, all official capacity claims against Defendants Ross, Smith, McCall, Flynn, Danner, Flynn, Dyer, Blumberg, Friday, Soto Ocasio, Osborn, Page, and Gerber will be dismissed.

### C.    Fourteenth Amendment

The Court construes Harris's claim that Agent Ross imposed "unconstitutional parole conditions" and enforced those conditions in an unconstitutionally arbitrary or discriminatory manner to be a claim for a violation of due process and equal protection rights under the Fourteenth Amendment. Am. Compl. at 17. Determining whether a plaintiff's procedural due process rights have been violated is a two-step process. First, the court must determine "[w]hether any procedural protections are due" by deciding whether a "liberty or property" interest within the meaning of the Fourteenth Amendment's Due Process Clause is at stake. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Second, should the Due Process Clause attach, the court determines "what process is due," keeping in mind that "due process is flexible and calls for such procedural protections as the particular situation demands." *Id.*

13

As to the first step, the United States Supreme Court has recognized that an individual on a parole has a liberty interest in relation to any potential revocation of parole. *Morrissey*, 408 U.S. at 482. As to what process is due, at a parole revocation hearing, a parolee is entitled to written notice of the claimed violations of parole; disclosure of the evidence; an opportunity to be heard in person and to present witnesses and documentary evidence; the right to confront and cross-examine adverse witnesses; a neutral and detached hearing body to consider revocation; and a written statement by the factfinders as to evidence relied on and the reasons for revoking parole. *Id.* at 489. A parole revocation hearing need not apply the evidentiary standards required in a criminal trial and may include consideration of letters and affidavits not admissible at a trial, but it must be "structured to assure that the finding of a parole violation will be based on verified facts and that the exercise of discretion will be informed by an accurate knowledge of the parolee's behavior." *Id.* at 484.

The record is clear that Harris received these required procedures at his parole revocation hearing, which resulted in the termination of his case without any additional incarceration. Although he claims that he did not receive sufficient time to prepare for the hearing, and that certain documents were not available, the hearing occurred six weeks after his arrest, he was represented by counsel, and neither he nor his attorney argued that they had insufficient time or ability to prepare for the hearing, which resulted in no additional prison time.

To the extent that Harris's claim may relate to the changes in his reporting requirements, the imposition of COMET supervision, or his arrest in advance of the parole revocation hearing, the record does not demonstrate any due process violations. While under mandatory supervision, Harris was required to comply with "all laws, rules, regulations, and conditions that apply to parolees" and also with "any special conditions established by a commissioner." Md. Code Ann.,

14

Corr. Servs. § 7–502(b) (West 2017).  To the extent that Harris complains of Agent Ross's changes to the specific reporting requirements, such as changing from in-person meetings to phone calls, changing the phone number for reporting, or not being available at certain times, those procedures do not violate due process.

As for the institution of COMET supervision after Harris had completed almost ten years of generalized mandatory supervision, the Maryland Court of Special Appeals has upheld the imposition of COMET supervision as a special condition of probation. *Russell v. State*, 109 A.3d 1249, 1263–64 (Md. Ct. Spec. App. 2015).  The same court has also upheld the imposition of COMET supervision on a parolee who was not convicted of a sex crime, when the facts underlying the offense of conviction reflected that the crime was sexual in nature.  *See Maddox v. Parole Comm'n. of Md.*, No. 1222, 2022 WL 2693109, at *3, *5 (Md. Ct. Spec. App. July 12, 2022). Here, the record demonstrates that the facts underlying Harris's offenses of conviction included charges of rape, attempted rape, and third-degree sex offense.

Moreover, such conditions may be imposed without judicial review because mandatory release, like parole, is "uniquely an executive function and the enforcement and regulation thereof is vested solely within the Division of Parole and Probation." *Hillard v. State*, 784 A.2d 1134, 1140 (Md. Ct. Spec. App. 2001); *see Simms v. State*, 501 A.2d 1338, 1340 (Md. Ct. Spec. App. 1986). The authority to impose special conditions on an inmate's mandatory supervision release is "broad by design" and lies within the discretion of the Maryland Parole Commission. *Maddox*, 2022 WL 2693109, at *3 (citing Md. Code Ann., Corr. Servs § 7–502(b) and Md. Code Regs. 12.08.01.21.E (2022)).

As for the issuance of a warrant and Harris's arrest, the Maryland Parole Commission ultimately concluded that Harris failed to report as required after July 20, 2020, and the record

provides no basis to conclude otherwise, so the issuance of the initial warrant was proper and was not based on false statements. As for the second warrant, regardless of whether, as claimed by Harris, Agent Ross told him at the time of his first arrest that he no longer needed to report to her, the record reflects that there was a valid warrant, and that the initial failure to report referenced in the warrant remained unresolved, so the second arrest was valid.

To the extent that Harris's claim that Agent Ross enforced the conditions of his mandatory supervision in an arbitrary and discriminatory manner could be characterized as a substantive due process claim, that claim also fails. Substantive due process prevents "government officials from abusing their power" with conduct that is "arbitrary" or "shocks the conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998). The threshold question is whether the behavior of the government officer is "so egregious, so outrageous that it may fairly be said to shock the contemporary conscience." *Id.* at 847 n.8. If it meets this standard, the next step is to assess whether the conduct violates a liberty interest held by the plaintiff. *See Hawkins v. Freeman*, 195 F.3d 732, 738–39 (4th Cir. 1999) (stating that if an executive act does not shock the conscience, then there is "no need to inquire into the nature of the asserted liberty interest"). Harris's placement on COMET supervision, even after a 10-year period of general supervision due to a mistake in his designation, does not meet this standard. *See Lewis*, 523 U.S. at 849; *Hawkins*, 195 F.3d at 746–47 (finding that the revocation of parole mistakenly granted does not shock the conscience).

As for equal protection, although Harris references discrimination, he identifies no facts demonstrating that he was treated differently from other individuals based on any protected class or otherwise. A plaintiff asserting an equal protection claim must allege "that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the

16

result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001); *see Washington v. Davis*, 426 U.S. 229 (1976) ("The invidious quality of a law claimed to be ... discriminatory must ultimately be traced to a ... discriminatory purpose."). "The 'similarly situated' standard requires a plaintiff to identify persons materially identical to him ... who ha[ve] received different treatment." *Applegate, LP v. City of Frederick*, 179 F. Supp. 3d 522, 531 (D. Md. 2016) (citation omitted). Harris has provided no facts supporting any such differential treatment. Thus, any equal protection claim necessarily fails.

For all of these reasons, the Court does not find a violation of due process or equal protection and will grant summary judgment on these claims.

### D.   First Amendment Retaliation

Defendants also argue that Harris has failed to state a plausible claim of retaliation in violation of the First Amendment. To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that: (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the plaintiff's First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020).

Here, Harris asserts that Agent Ross retaliated against him for reporting her conduct to her supervisor. As for the conduct that was allegedly retaliatory, the changes to reporting schedules do not rise to the level of conduct adversely affecting First Amendment rights, and, as discussed above, the imposition of COMET supervision was valid. *See supra* part II.C. As for the issuance of an arrest warrant, the Parole Commission found, and the record establishes, that the warrant was valid because there is no basis to dispute that Harris failed to report after July 20, 2020 and did not return the polygraph referral forms. Harris therefore cannot establish that the issuance of the

warrant was retaliatory. *See Martin*, 977 F.3d at 300 ("The causation element in retaliation claims asks whether the considerations which animated the defendant's conduct were permissible or impermissible."). The Court will therefore grant summary judgment on the retaliation claim.

### E.   Eighth Amendment

Harris's Eighth Amendment Claim against Commissioner Blumberg and Warden Friday for unconstitutional conditions of confinement at JCI also fails. Harris was detained at JCI for 46 days, from the time of his arrest on the warrant until the parole revocation hearing after which he was released. Specifically, Harris alleges that he was "locked in [a] hot humid cell without ventilation," he was in solitary confinement and only allowed 15 minutes per day out of his cell, he received no exercise, the cell frequently had raw sewage, rodents, and roaches on the floor, and he was not allowed to send or receive mail or to have cleaning supplies. Am. Compl. at 19.

The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Iko v. Shreve*, 535 F.3d 225, 238 (quoting *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). Conditions of confinement that "involve wanton and unnecessary infliction of pain," or which "deprive inmates of the minimal civilized measure of life's necessities," may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, conditions that are merely restrictive or even harsh "are part of the penalty that criminal offenders pay for their offenses against society." *Id.* In order to establish the imposition of cruel and unusual punishment in conditions of confinement, a prisoner must prove two elements: that "'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that *subjectively* the officials act[ed] with a sufficiently culpable state of mind.'" *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be

called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko*, 535 F.3d at 238 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298–300 (1991)).

The objective prong of a conditions claim requires the prisoner to "'produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions,' or demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions." *Shakka*, 71 F.3d at 166 (quoting *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993)). To establish a sufficiently culpable state of mind, there must be evidence of deliberate indifference, in that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson v. Seiter*, 501 U.S. 294, 302–03 (1991) (applying the deliberate indifference standard to conditions of confinement claims). "[T]he test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).

Here, the allegations regarding the conditions at JCI during Harris's brief stay, even if describing problematic conditions, provide no specific facts that would substantiate Harris's uncorroborated claim that he, a parolee subject to revocation for failing to comply with conditions, was subjected to solitary confinement under draconian conditions. Even assuming his description of the conditions to be true, as is required on a motion to dismiss, Harris has not provided any allegations or facts demonstrating that either Commissioner Blumberg or Warden Friday had any knowledge of such conditions or were aware that Harris had been placed in such conditions. Further, there are no allegations or facts demonstrating that Harris suffered any actual injury from the described conditions. The Eighth Amendment claim will therefore be dismissed.

19

**F.      42 U.S.C. §§ 1981 and 1985**

Harris's claims under 42 U.S.C. § 1981 and 42 U.S.C. § 1985 will be dismissed for failure to state plausible claims for relief.  Section 1981 guarantees equal rights under the law and provides that all persons shall have the same right to "make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens" and shall be "subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."  42 U.S.C. § 1981(a) (2018).  Thus, a violation of § 1981 requires a showing of discrimination or unequal treatment based on race.  The Amended Complaint, however, alleges no facts that would support a finding that Harris was treated differently based on race.

The only arguably relevant portion of § 1985 prohibits a conspiracy to interfere with civil rights consisting of two or more persons conspiring to deprive another person "of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3).  Thus, a § 1985 conspiracy claim requires "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268–69 (1993) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)).  As discussed above, Harris has made no plausible allegations that his treatment was the result of discrimination based on race or some other class of which he was a member.  *See supra* part II.C.; *see Francis v. Giacomelli*, 588 F.3d 186, 196–97 (4th Cir. 2009) (holding that an allegation that defendants conspired to violate plaintiff's civil rights was not enough to state a § 1985 claim without supporting facts).  The Court therefore finds that Harris has failed to state valid claims under § 1981 or § 1985.

G.    False Imprisonment and Malicious Prosecution

In the Amended Complaint, Harris asserts that several Defendants, including Agent Ross, Smith, Thomas, Soto Ocasio, Osborn, and the Jennifer Road Detention Center, engaged in false imprisonment, wrongful arrest, or detention without a valid warrant. A common law false imprisonment claim requires a showing of: (1) the deprivation of the liberty of another; (2) without consent; and (3) without legal justification. *Heron v. Strader*, 761 A.2d 56, 59 (Md. 2000). "The test of legal justification, in the context of false arrest and false imprisonment [for which causes of action the elements are the same], is judged by the principles applicable to the law of arrest." *Carter v. Aramark Sports and Ent. Servs., Inc.*, 835 A.2d 262, 284 (Md. Ct. Spec. App. 2003) (brackets in original). "Legal justification is the equivalent of legal authority." *K-Mart Corp. v. Salmon*, 547 A.2d 1069, 1076 (Md. Ct. Spec. App. 1988), *overruled on other grounds by Montgomery Ward v. Wilson*, 664 A.2d 916 (Md. Ct. App. 1995).

Here, the applicable regulations on revocation of parole or mandatory release place the responsibility for applying for a warrant on the supervising parole agent. Md. Code Regs. 12.08.01.22.B (2022). The record establishes that a warrant had issued before the arrest on July 27, 2020. Where Harris has presented no facts disputing, and the Parole Commissioner later found, that Harris failed to report as required during and after July 2020, the warrant was supported by probable cause or reasonable grounds to believe that a parole violation had occurred. *See* Md. Code Regs. 12.08.01.22.E.4 (noting that review at a post-arrest preliminary hearing is for whether there was probable cause or reasonable grounds to believe that a violation of parole has occurred); *Samson v. California*, 547 U.S. 843, 850 (2006) ("[P]arolees are on the 'continuum' of state-imposed punishments . . . [and] have fewer expectations of privacy than probationers because parole is more akin to imprisonment."). Because a valid warrant was issued for Harris's arrest,

21

the arrest was legally justified. *Feaster v. State*, 47 A.3d 1051, 1059 (Md. Ct. Spec. App. 2012) (noting that a parolee has diminished Fourth Amendment rights and can be arrested even without probable cause). Thus, Harris does not have a valid false imprisonment claim.

Harris also alleges malicious prosecution by Agent Ross, Smith, Danner, and Flynn. Under Maryland law, a malicious prosecution claim requires a showing that: (1) the defendant instituted a criminal proceeding against the plaintiff; (2) the criminal proceeding was resolved in the plaintiff's favor; (3) the defendant did not have probable cause to institute the proceeding; and (4) the defendant acted with malice or a primary purpose other than bringing the plaintiff to justice. *Okwa v. Harper*, 757 A.2d 118, 130 (Md. 2000). Thus, "the termination of those proceedings in the defendant's favor as a necessary element of the cause of action." *Heron*, 761 A.2d at 59. Here, even if the revocation hearing is construed as a criminal proceeding instituted against Harris, the Parole Commissioner concluded that Harris violated the reporting requirement of his mandatory supervision conditions. Based on this ruling adverse to Harris, even though no additional prison time was imposed, the proceeding was not resolved and terminated in Harris's favor, so the Court finds that the malicious prosecution claim fails.

### III.    The Unserved Defendants

Service has not yet been accepted on behalf of Defendants Thomas, Soto Ocasio, Dyer, and Jennifer Road Detention Center. However, because Harris filed his Complaint *in forma pauperis* pursuant to 28 U.S.C. § 1915(a)(1), the Court is required to screen the claims and dismiss any that are frivolous or malicious or fail to state a claim on which relief may be granted. 28 U.S.C. § 1915(e)(2)(B)(i), (ii). In doing so, the Court must hold the self-represented complaint to "less stringent standards than pleadings drafted by attorneys and must read the complaint liberally." *White v. White,* 886 F. 2d 721, 722–23 (4th Cir. 1989). Here, the only claims against

Thomas and Soto Ocasio are that these officers arrested Harris wrongfully, without a valid warrant, and therefore engaged in common law false imprisonment.  As discussed above, Harris has failed to allege facts that would show that his arrest by Thomas and Soto Ocasio was unlawful in that it was not pursuant to a valid warrant. *See supra* part II.G.  In turn, there is no basis to hold liable the Jennifer Road Detention Center, at which he was apparently detained briefly after the arrest. Finally, Harris raises no claims as to Dyer; rather he simply mentions that she offered to decrease the level of his parole supervision prior to his supervision being transferred to Agent Ross. Accordingly, Harris has failed to state any valid claims against the Unserved Defendants, so the claims against them will be dismissed pursuant to 28 U.S.C. § 1915(e)(2).

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment will be GRANTED.  The claims against the Unserved Defendants will be DISMISSED pursuant to 28 U.S.C. § 1915(e)(2).  A separate Order shall issue.

Date:  March 17, 2023

THEODORE D. CHUANG
United States District Judge